**Joseph M. and Evelyn MUHEIM et al., Appellants,**

**v.**

**UNITED STATES of America, Appellee.**

**No. 74–1145.**

United States Court of Appeals, Ninth Circuit.

Oct. 14, 1975.

16. In particular, we reject CB & I's contention that the judgment should be reversed because of a "plan" between Hess and the personal injury plaintiffs to place the entire blame on CB & I. There is nothing in the record indicating any impropriety on the part of counsel for the plaintiffs or Hess, and there is certainly nothing inherently improper in one defendant adopting the trial strategy that the other defendant was solely responsible for the accident.

David W. Richter (argued), of Bilby, Thompson, Shoenhair & Warnock, Tucson, Ariz., for appellants.

George G. Wolf, Atty. (argued), U. S. Dept. of Justice, Tax. Div., Washington, D. C., for appellee.

Before CHOY and GOODWIN, Circuit Judges, and TAYLOR,* District Judge.

PER CURIAM:

Following partial denial of a refund in the proceedings below, taxpayers appeal, challenging the ruling that the imputed-interest section, Internal Revenue Code of 1954, § 483,[1] should be applied to payments received by taxpayers from a mining company.

In 1963, after the effective date of § 483, taxpayers entered into a contract with the Banner Mining Company whereby Banner obtained exclusive possession of, and the right to explore and extract minerals from, forty unpatented mining claims owned by taxpayers in Arizona. The agreement, labeled "lease and option", required Banner to make certain minimum expenditures for exploration and development work on the properties and to make quarterly royalty payments once extraction and production began. The contract also called for a guaranteed "minimum royalty" payment if royalties from actual production did not exceed the minimum.

Banner acquired the right to purchase the property for $1,600,000 cash at any time; meanwhile, royalty payments or "minimum royalty" payments, if any, would be credited against the $1,600,000 purchase price. Taxpayers placed deeds to the properties in escrow.

Taxpayers had the right to terminate the agreement if Banner failed to make the agreed payments, and Banner could terminate, for any reason, on thirty days' notice. In either event, taxpayers were entitled to retain payments made prior to the date of termination.

Banner could, by accelerating its payments, obtain fee ownership of the claims any time the total reached $1,600,000, provided that payments in 1963 did not exceed 29% of the purchase price. During the tax years in question, 1966–68, Banner did not elect to accelerate payment, nor did it begin production of ore from the claims. All "minimum royalty" payments received in those years were reported by taxpayers as long-term capital gains from the sale of a capital asset. Upon audit, the Commissioner did not challenge the capital-gains treatments, but did allocate a por-

---

* The Honorable Fred M. Taylor, Senior United States District Judge for the District of Idaho, sitting by designation.

1. Section 483, "Interest on certain deferred payments," allocates a portion of certain payments under an installment-sale contract to interest income. The portion of the section most pertinent to this case is § 483(d), which provides:

"In the case of a contract for the sale or exchange of property under which the liability for, or the amount or due date of, any portion of a payment cannot be determined at the time of the sale or exchange, *this section shall be separately applied to such portion as if it* (and any amount of interest attributable to such portion) *were the only payments due under the contract;* and such determinations of liability, amount, and due date shall be made at the time payment of such portion is made." (Emphasis added.)

tion of each payment to interest under § 483.

None of the parties disputes the characterization of the transaction as a sale of a capital asset. They dispute whether the transaction amounted to a sale which is subject to § 483 of the Internal Revenue Code.

■ The taxpayers have argued here, as they did below, that there was no such sale. They argue that because they retained an economic interest in the claims the transaction did not constitute a single, completed sale at its inception, but rather a series of fractional sales, none subject to § 483. The district court disregarded the "lease" language and held that the parties intended the sale to be a completed installment sale. The court correctly held that the title retained by the taxpayers was solely a security interest to be extinguished upon payment of the final installment of the purchase price. The district court imputed interest under § 483 and Reg. § 1.483–1(e).

The authorities cited by the parties primarily discuss variations of lease-and-option agreements and consider whether, for tax purposes, the transaction in question in each case should be characterized as a sale or a lease, or whether the depletion allowance is available. *Helvering v. Elbe Oil Land Co.*, 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904 (1938); *J. Bryant Kasey*, 33 T.C. 656 (1960); *Ima Mines Corp.*, 32 T.C. 1360 (1959); *Lincoln D. Godshall*, 13 T.C. 681 (1949); and G.C.M. 23,999, 1943 Cum.Bull. 144.

The taxpayers rely heavily on G.C.M. 23,999 and the "retained economic interest" which it discussed for the purposes of allocation of the depletion allowance. While the G.C.M. contains some language supporting the taxpayer's contention, reliance on it here is misplaced. On the facts of this case, the parties contracted for a sale, and the district court properly disregarded the title of the instrument in concluding that the substance of the agreement was a completed installment sale.

While we rest our affirmance on the substance of the transaction, we note that the G.C.M. does not have the force of law, *Dixon v. United States*, 381 U.S. 68, 73, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965), and no longer represents the view of the IRS, Rev.Rul. 70–277, 1970–1 Cum.Bull. 280.

The district court, after studying the contract and the circumstances surrounding it, found that the intent of the parties was to make an installment sale. Not only is this finding "not clearly erroneous," but it is the most logical finding possible given the evidence: The contract provided a "schedule" of payments, which could be accelerated either by Banner's election or by Banner's success in producing ore. The schedule of payments could not be reduced, however, without losing the property. The contract stated that Banner could not pay more than 29% of the purchase price in 1963, the year of contract—a clear attempt to obtain the favorable tax treatment of installment sales. Int.Rev.Code § 453. If production were begun, then the royalty payments were to be applied to the subsequent period's "minimum royalty" payments. Banner had exclusive control over the mining claims during the period in question. The parties made no partitioning of the claims in any way which would evidence "fractional" sales.

■ Taxpayers assert that because Banner had a right to terminate payments and abandon the contract upon thirty days' notice, the sale was not complete for § 483 purposes. This result does not follow; § 483(d) anticipates title-retaining installment contracts, and provides for an accounting method to deal with them. The purchaser's right to terminate its duty to pay future installments by electing to forfeit its rights does not vitiate the "completeness" of the initial transaction. The purchaser's option is not a condition precedent to the sale, as taxpayers suggest, but is rather in the nature of a condition subsequent, anticipated by § 483(d).

Except for the contract's rather direct method of extinguishing the purchaser's interest in the mining claims upon the purchaser's election to abandon performance and the employment of the "lease and option" label on the top of the papers, the agreement is in substance little different from a conventional installment sale of land with an escrow agreement.

Affirmed.