HAZEL DESKINS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4302-84.       Filed August 11, 1986.

---

[4] As previously noted, Jephson Finance was at all times an investment company.

306

*John G. Rocovich, Jr., Joseph L. Anthony,* and *John T. Arnold,* for the petitioner.

*Edwina L. Wilson,* for the respondent.

PARKER, *Judge:* Respondent determined a deficiency in petitioner's 1980 Federal income taxes in the amount of $54,469.32. The issues for decision are (1) whether under the contract petitioner retained an economic interest in the coal so that payments she receives for the disposition of the coal qualify for capital gain treatment under sections 631(c)[1] and 1231(b)(2), and (2) if section 631(c) does not apply, whether the payments she receives for the coal are subject to the imputed interest rules of section 483.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years pertinent to this case, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioner resided in Belfry, Kentucky, at the time she filed the petition in this case. Petitioner filed her 1980 Federal income tax return (Form 1040) with the Internal Revenue Service Center in Memphis, Tennessee.

Petitioner acquired legal title to two tracts of real property (the property) situated on the Fifty-Eight Mile Branch of Racoon Creek, a tributary of Johns Creek, in Pike County, Kentucky, by a deed from Troy T. Deskins dated June 24, 1964. Petitioner held the property for over 12 years prior to the transaction involved herein.

Wellmore Coal Corp. (Wellmore), through its parent corporation, United Coal Cos., obtained a Reserve Estimate (the estimate report) dated February 25, 1977, from Thompson & Litton, Inc., Professional Engineers, on certain seams of coal in the property. Included in the estimate report is a survey map of the property that shows the topography of the property and the coal seams therein. The estimate report concludes that there are 6.8 million tons of coal in place and 4.3 million tons of recoverable coal in the property.[2] The 4.3 million tons of recoverable coal in the property could easily be mined in 4 years.

On February 25, 1977, petitioner[3] and Wellmore entered into a contract (the contract) entitled "Coal Lease," the purpose of which was to dispose of coal in place in the property. The contract grants to Wellmore mining rights to all coal in, and complete and absolute surface rights over, the property. The contract remains in effect for such period of time necessary to mine the merchantable and recoverable coal. The contract states that the parties agree that there are 4.3 million tons of minable and merchantable coal in the

---

[2] Coal "in place" is the total amount of coal that is in the ground. "Recoverable" coal is an estimate of the amount of coal that can actually be extracted from the property based on historical information and the engineer's experience. According to the estimate report, the percentage of recovery for deep mining varies from 50 to 75 percent. The estimate report uses a recovery percentage of roughly 63 percent.

[3] The contract is between Hazel Deskins Burke and Wellmore. Petitioner is the same person referred to in the contract as Hazel Deskins Burke.

property that can be recovered in a 10-year period.[4] The contract requires Wellmore to pay petitioner a tonnage royalty of $1 per ton mined, payable monthly not later than the 25th day of the month following the month the coal is mined. However, the contract provides that Wellmore's obligation to pay tonnage and/or annual minimum royalties to petitioner ceases after it pays her a total of $4.3 million, even if Wellmore mines more than 4.3 million tons of coal.[5] Thus, the maximum amount petitioner will receive under the contract is $4.3 million.

Wellmore is obligated by the contract to pay petitioner an annual minimum royalty of $430,000 each year for 10 years, not later than the 25th day of the month following the end of each year. Thus, the minimum amount petitioner will receive is also $4.3 million. See note 5 *supra*.

Any tonnage royalty petitioner receives during a year is credited against the annual minimum royalty due for that year. If the tonnage royalty due during a year exceeds the annual minimum royalty for the year, Wellmore may recoup the excess against any annual minimum royalty paid during any prior years and may apply any remaining excess tonnage royalty as a prepayment of any annual minimum royalty due in any future year or years.[6] Tonnage royalties

---

[4] The contract expressly states in the Duration provision that:

"Lessee firmly and absolutely agrees to produce such tonnage of coal during such 10-year term and/or pay the actual and/or minimum royalties herein provided for when and as they become due. The agreed recoverable tonnage is firm, absolute and not subject to change or alteration on any basis. The amount of minimum royalty to be paid is also firm, absolute and not subject to change on any basis. This lease shall be construed as a Coal Lease for production of an agreed tonnage of coal (the agreed tonnage of which is also absolute and not subject to change on any basis) with a commitment to mine and pay for the coal on the basis of the actual tonnage royalty and/or the minimum annual royalty during the term as herein provided."

[5] Specifically, the contract states in the Tonnage Royalty provision that:

"Once $4,300,000 has been paid by way of actual tonnage and/or annual minimum royalties as provided, all royalties shall cease and Lessor [sic] shall not be required to pay any further sums hereunder."

Similarly, in the Minimum Royalty provision, the contract states:

"The intention of the parties, in providing for the annual minimum royalty, is to insure that the Lessee [sic] shall actually receive by way of actual tonnage and/or annual minimum royalties, at least $430,000 per lease year, or a total of $4,300,000 over the entire ten (10) year period. Thereafter, there shall be no further minimum royalty and no covenant by Lessee to diligently mine."

[6] The following example illustrates the interplay of the contract's royalty and recoupment provisions. If Wellmore mines no coal during year one, it must still pay petitioner $430,000 that year as an annual minimum royalty. If Wellmore mines 1 million tons of coal during year two, it can "recoup" $430,000 of the $1 million tonnage royalty due against the annual

309

are payable as coal is mined so that if Wellmore mines 4.3 million tons of coal before the 10-year contract period expires, petitioner will receive the $4.3 million over the shorter period of time. Thus, under the contract, petitioner will receive tonnage and/or annual minimum royalties of $4.3 million, no more and no less, over 10 years or less, regardless of whether any coal is ever actually mined. See notes 4, 5, 6 *supra*.

No portion of the payments to be made under the contract is designated as interest.

The contract states that "the economic interest in and to the coal in, on and under the [property] for income tax and all other purposes shall be deemed, construed and shall be in [Wellmore]." The contract contains a "diligent mining provision" that requires Wellmore to diligently mine the coal as expeditiously as possible using modern and efficient mining machinery, equipment, and methods, so as to mine the largest feasible tonnage in the shortest feasible time.[7] If Wellmore fails to make the payments required by the

minimum royalty it paid for year one. Thus, Wellmore would have to *pay* $570,000 as tonnage royalty for year two ($1 million tonnage royalty due less $430,000 "recouped" annual minimum royalty paid for year one). If Wellmore mines no coal during year three, $140,000 of the tonnage royalty for year two ($570,000 tonnage royalty paid for year two less $430,000 annual minimum royalty for year two) is applied as a prepayment of the annual minimum royalty for year three, so that Wellmore would have to pay only an additional $290,000 ($430,000 annual minimum royalty due less $140,000 excess tonnage royalty paid for year two) as an annual minimum royalty for year three.

[7] Petitioner argues that the diligent mining provision of her contract was "extraordinarily stringent," that it somehow imposed a duty on Wellmore to mine and remove the coal and pay the royalties as expeditiously as possible in the shortest feasible time. The diligent mining provision of the contract states that:

"Lessee covenants and agrees to forthwith enter upon such property, commence mining the coal thereon and to diligently mine the same as expeditiously as possible using modern and efficient mining machinery, equipment and methods, now known or as may be developed, so as to mine and produce the largest feasible tonnage of coal in the shortest feasible period of time."

As will be discussed further in the opinion below, the interplay of the maximum total sum of $4,300,000 and the full application of the annual minimum royalties against this total sum without any time limit (other than the 10-year period) does not serve to expedite mining. Moreover, the diligent mining provision is undercut by other provisions in the contract. See the Duration provision which states "Lessee firmly and absolutely agrees to produce such tonnage of coal during such 10-year term *and/or* pay the actual and/or minimum royalties herein provided for when and as they become due." (Emphasis added.) Thus, not even the 10-year period is absolute; only payment of $4.3 million is absolute. Furthermore, the Conduct of Mining Operations clause notes that Wellmore "is or may be conducting mining operations on lands owned by numerous Lessors" and will conduct its mining operations according to a plan that will take into consideration "the entire area proposed to be developed" by Wellmore. For all these reasons, we cannot find that the diligent mining provision was stringent or compelled any mining during the 10-year period or any other period.

contract, petitioner can accelerate the as yet unpaid annual minimum royalties ($4,300,000 less any actual tonnage and/or annual minimum royalties paid to such date), and unless Wellmore cures the default, the contract terminates and petitioner can retake possession of the property and all fixtures, machinery, equipment, and other property placed thereon by Wellmore, free and clear of any claim by Wellmore. If Wellmore makes the required payments ($4,300,000), petitioner has no reversionary interest in the coal and Wellmore retains the right to mine the coal after the 10-year contract period, free of any further royalty payment.

The contract is a typical coal lease in that it contains the essential provisions of a coal lease. It is atypical, however, in several respects. Most coal leases do not specify a maximum amount of royalties payable. In those coal leases that specify a maximum, the maximum and minimum amount of royalties payable are rarely equal, as they are in the instant contract. A maximum is usually stated only when the parties have a third-party estimate of the approximate tonnage of coal in place. The contract's recoupment provision is unusual in that it does not state a cutoff period after which tonnage royalties due cannot be recouped from previously paid or future annual minimum royalties. See notes 4, 5, 6 *supra*. The annual minimum royalties of $430,000 can be applied to reduce any tonnage royalties at any time during the 10-year period, and after payment of a total sum of $4,300,000 of annual minimum royalties and/or tonnage royalties, no further royalties are payable to petitioner. See notes 4, 5, 6 *supra*.

At the time the parties entered into the contract, the typical tonnage royalty for deep mine coal was about 8 percent of gross sales which amounted to about $2 per ton. The contract's $1 per ton royalty resulted from the parties' negotiations and reflected petitioner's willingness to accept a lower royalty in exchange for payments over a shorter period of time, 10 years rather than the usual 20 or 30 years for coal leases. Petitioner relied on the estimate of recoverable coal in negotiating the tonnage royalty.

Petitioner was represented by C. Kilmer Combs (Combs), an attorney, and Caleb B. Cooley (Cooley), a certified public

accountant, during the negotiation of the contract. They advised petitioner to dispose of the coal in such a manner that she would receive the proceeds therefrom in a relatively short period of time. Petitioner instructed Combs and Cooley to negotiate and draft the contract so that she could obtain the most favorable tax consequences thereunder. She hoped to receive capital gain treatment on the entire proceeds.

To the date of the trial, Wellmore had not mined any coal from the property. Wellmore has not defaulted on its obligations under the contract, and its right to mine the coal has not expired, terminated, or been abandoned. Wellmore has paid petitioner the annual minimum royalty under the contract in the amount of $430,000 each year since 1978. Cooley has prepared petitioner's Federal income tax return each year since the date of the contract and has consistently treated the annual minimum royalties as long-term capital gain income from the sale of coal in place.[8]

During 1980, petitioner received an annual minimum royalty payment under the contract in the amount of $430,000. No coal was mined from the property during that year. On the Schedule D, Capital Gains and Losses, attached to her 1980 return, petitioner reported the $430,000 payment as long-term capital gain from the sale of coal in place. By statutory notice of deficiency dated November 23, 1983, respondent determined that $129,688.86 of the $430,000 payment was ordinary interest income under sections 483 and 61(a)(4), and adjusted petitioner's taxable income accordingly.

## ULTIMATE FINDING OF FACT

Petitioner did not retain an economic interest in the coal.

---

[8] Although the facts are not relevant or material to any issue in this case, the record further shows that Wellmore consistently treated the annual minimum royalties it paid petitioner as a deductible royalty expense (sec. 1.612-3(b)(1), Income Tax Regs.) until its return was audited by the Internal Revenue Service (the Service). At the appeals level, the Service determined that portions of Wellmore's payments to petitioner were deductible as imputed interest under secs. 483 and 163. The remaining portions were treated as annual installment payments to purchase coal reserves. The Service had audited petitioner's 1979 return and made no adjustments to her treatment of the annual minimum royalty she received that year.

## OPINION

This case involves a "Coal Lease" contract under which petitioner will receive $4.3 million, no more and no less, regardless of the number of tons of coal mined or regardless of whether any coal is mined. The issue before the Court is whether the disposition of the coal comes within section 631(c), and therefore section 1231(b)(2), so that each payment received is a sale or exchange entitled to capital gain treatment, or whether the transaction was an outright sale of a capital asset subject to the imputed interest provisions of section 483. This turns on whether, under the contract, petitioner retained an economic interest in the coal.

Royalty income received under a lease granting rights to extract minerals in place is usually ordinary income. *Davis v. Commissioner*, 74 T.C. 881, 890 (1980), affd. 746 F.2d 357 (6th Cir. 1984). See *Burnet v. Harmel*, 287 U.S. 103 (1932). Generally, if the owner-lessor retains an economic interest in the minerals being mined, the transaction is a lease and not a "sale or exchange," the latter being a prerequisite to capital gain treatment under section 1222. *Davis v. Commissioner*, 74 T.C. at 890. See *Palmer v. Bender*, 287 U.S. 551 (1933); *Belknap v. United States*, 406 F.2d 737 (6th Cir. 1969).

However, to provide special relief to recipients of coal royalties, Congress enacted the predecessor of section 631(c). S. Rept. 781, 82d Cong., lst Sess. (1951), 1951-2 C.B. 458, 488. Section 631(c)[9] treats a disposal of coal as a *sale* if, inter alia, the disposal is "under any form of contract by virtue of which such owner retains an economic interest in such coal." Section 1231(b)(2)[10] treats section 631(c) coal as

---

[9] During 1980, sec. 631(c) provided in pertinent part as follows:

(c) DISPOSAL OF COAL OR DOMESTIC IRON ORE WITH A RETAINED ECONOMIC INTEREST.—In the case of the disposal of coal (including lignite), or iron ore mined in the United States, held for more than 1 year before such disposal, by the owner thereof *under any form of contract by virtue of which such owner retains an economic interest in such coal* or iron ore, the difference between the amount realized from the disposal of such coal or iron ore and the adjusted depletion basis thereof plus the deductions disallowed for the taxable year under section 272 shall be considered as though it were a gain or loss, as the case may be, on the sale of such coal or iron ore. Such owner shall not be entitled to the allowance for percentage depletion provided in section 613 with respect to such coal or iron ore. * * * The date of disposal of such coal or iron ore shall be deemed to be the date such coal or iron ore is mined. * * * [Emphasis added.]

[10] Sec. 1231(b)(2) provides as follows:

property used in the trade or business. Thus, gain or loss from the disposal (treated as a sale by section 631(c)) of such coal is characterized under section 1231(a). See sec. 1.1231-1(c)(3), Income Tax Regs. In short, taken together, sections 631(c) and 1231(b)(2) convert coal royalties that would otherwise be ordinary income into capital gain, if there is a gain, or into ordinary loss, if there is a loss. See *Davis v. Commissioner*, 74 T.C. at 891-892. If a disposal of coal qualifies for section 631(c) treatment, the date of disposal is deemed to be the date the coal is mined or the date the minimum royalty payments are received, and section 483 does not apply to the payments received. H. Rept. 749, 88th Cong., 1st Sess. (1963), 1964-1 C.B. (Part 2) 125, 198. See secs. 1.483-1(b)(1), 1.631-3(b)(1), and 1.631-3(c)(1), Income Tax Regs.

As previously stated, for section 631(c) to apply, the owner must dispose of coal under a contract by which the owner *retains an economic interest* in the coal. A taxpayer has an economic interest in coal if he has (1) acquired by investment any interest in the coal in place, and (2) secured by any legal relationship income derived from the extraction of the coal to which he must look for a return of his capital.[11] *Commissioner v. Southwest Exploration Co.*, 350 U.S. 308, 314 (1956), quoting *Palmer v. Bender*, 287 U.S. at 557; *Freede v. Commissioner*, 86 T.C. 340 (1986) (Court-reviewed), and cases cited therein.

In applying the economic interest test, we must consider economic realities, not legal abstractions. *Gulf Oil Corp. v. Commissioner*, 86 T.C. 115, 134 (1986). See *Commissioner v. Southwest Exploration Co.*, 350 U.S. at 315. Retention of an economic interest does not turn merely on the subtleties of draftsmanship, the formal attributes or descriptive terminology of an instrument, or local law. *Whitehead v. United States*, 555 F.2d 1290, 1292 (5th Cir. 1977), and cases cited therein; *Gitzinger v. United States*, 404 F.2d 191, 193 (6th

---

(2) TIMBER, COAL, OR DOMESTIC IRON ORE.—Such term [property used in the trade or business] includes timber, coal, and iron ore with respect to which section 631 applies.

[11] This definition has been incorporated into the regulations. Sec. 1.611-1(b)(1), Income Tax Regs., provides as follows:

"An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital. * * *"

Cir. 1968). We must view the entire transaction to determine its total effect. *Gulf Oil Corp. v. Commissioner*, 86 T.C. at 134. No one factor clearly indicates ownership of an economic interest in mineral in place. *Freede v. Commissioner*, 86 T.C. at 348. The determination depends on the totality of the facts of each case. *Ramey v. Commissioner*, 398 F.2d 478, 478-479 (6th Cir. 1968). See *Kirby Petroleum Co. v. Commissioner*, 326 U.S. 599, 606 (1946); *Lesher v. Commissioner*, 73 T.C. 340, 360 (1979), affd. on another issue 638 F.2d 64 (8th Cir. 1981).

The parties do not dispute that petitioner satisfies the first prong of the economic interest test. They disagree about the second prong—whether petitioner secured by any legal relationship income derived from extraction of the coal to which she must look for a return of her capital. This language has been interpreted to mean that the taxpayer must look *solely* to extraction of the mineral for the return of her capital. *Commissioner v. Southwest Exploration Co.*, 350 U.S. at 314; *O'Connor v. Commissioner*, 78 T.C. 1, 10-11 (1982). Respondent argues that here petitioner need not look *solely* to the extraction of the coal for a return of her capital because under the contract she will receive $4.3 million for 4.3 million tons of coal *regardless* of whether any coal is ever actually mined. Thus, respondent contends, petitioner did not retain an economic interest in the coal, and section 631(c) does not apply to the payments petitioner receives under the contract. Therefore, the contract is an installment sales agreement to which section 483 applies.

In making these arguments, respondent relies heavily upon *Muheim v. United States*, an unreported case (D. Ariz. 1973, 32 AFTR 2d 73-5920, 73-2 USTC par. 9726), affd. per curiam 524 F.2d 773 (9th Cir. 1975). There, the taxpayers entered into an agreement labeled "lease and option" whereby the taxpayers transferred exclusive possession of and the right to explore for minerals in 40 unpatented lode mining claims in Pima County, Arizona, for the term of the agreement. The transferee was obligated to pay the taxpayers annual minimum royalties and earned royalties once production began. Earned royalties were to be credited first against the fixed minimum royalty for the year and then against the fixed minimum royalty for the following year.

The agreement also gave the transferee an exclusive option to purchase the mining claims for a sum certain, all prior minimum and earned royalties to be applied toward the purchase price. The taxpayers conceded that the transaction was a sale of the mining claims, but argued against application of section 483, insisting that they retained an economic interest in the mines and that each fixed minimum payment represented a sale of only a fraction of their interest in the asset. The District Court held that the taxpayers had nothing that could be treated as a retained economic interest in the property and that the transaction was an installment sale subject to the imputed interest rules of section 483. *Muheim v. United States, supra*, 32 AFTR 2d at 73-5921, 73-5922, 73-2 USTC at 82,356, 82,357. The Court of Appeals for the Ninth Circuit affirmed, noting that with minor exceptions the contract involved was "in substance little different from a conventional installment sale of land with an escrow agreement." *Muheim v. United States*, 524 F.2d at 776.

The result in *Muheim* is similar to the result respondent contends for here. Because both parties conceded the fact of a sale and because of the particular facts of that case, we consider *Muheim* to be helpful but hardly decisive in determining whether, under her contract, petitioner retained an economic interest in the coal. However, after carefully reviewing the relevant case law and the specific facts and contract provisions of this case, especially the practical effect of the contract, we agree with respondent that under the instant contract, petitioner did not retain an economic interest in the coal.

Under the contract, petitioner is to receive a tonnage royalty of $1 per ton of coal mined. The maximum amount petitioner can receive is $4.3 million. In addition, under the contract, petitioner is to receive $430,000 as an annual minimum royalty each year for 10 years. Thus, the minimum amount she can receive is also $4.3 million. Any tonnage royalty petitioner receives during a year is credited against the annual minimum royalty for the year. If petitioner is due tonnage royalties during a year that exceed the annual minimum royalty for the year ($430,000), such excess is recouped against any annual minimum royalty

received in past years and any remaining excess is applied as a prepayment of any annual minimum royalty due in the future. See note 6 *supra*. Thus, under the contract, petitioner will receive tonnage royalties and/or annual minimum royalties of $4.3 million, no more and no less, over 10 years or less, regardless of whether any coal is ever actually mined. Because petitioner will receive $4.3 million regardless of whether any coal is ever actually mined, she need not look to extraction of the coal for the return of her capital and, consequently, she has not retained an economic interest in the coal.

Understandably, petitioner does not agree. Petitioner says that she intended to, and must, look to tonnage royalties from extraction of the coal as her primary source of income. She argues that the provisions for tonnage and annual minimum royalties, recoupment of tonnage royalties against the annual minimum royalties, and due diligence in mining all work together to encourage extraction of the coal and the resulting payment of tonnage royalties. We do not agree with petitioner's assertion.

The contract's open-ended recoupment provision does not encourage extraction because Wellmore need not mine the coal within a limited period of time after paying an annual minimum royalty to avoid paying an additional tonnage royalty for the coal "paid for" with the annual minimum royalty. An example will illustrate the point. Under the contract, if Wellmore pays an annual minimum royalty of $430,000 in year one, it is relieved of the obligation to pay a tonnage royalty on 430,000 tons of coal regardless of when the coal is mined. If the contract limited the recoupment of tonnage royalties against annual minimum royalties to annual minimum royalties paid within, for example, 3 years of actual mining, tonnage royalties due on coal mined in year four could *not* be recouped against the annual minimum royalty paid in year one and would have to be paid *in addition to* such annual minimum royalty. Wellmore would in effect be paying for the coal twice. This arrangement would encourage Wellmore to mine coal within the recoupment period to avoid this result. On the other hand, the contract's open-ended recoupment provision *does not* encourage production because Wellmore will *never* have to pay

a tonnage royalty on coal already paid for by annual minimum royalties. See also notes 6, 7 *supra*. We note that up to the date of the trial, Wellmore had not mined any coal from the property.

Nevertheless, petitioner emphasizes that by enacting what is now section 631(c), Congress intended to subsidize domestic coal production. While this may be true (see S. Rept. 781, *supra*, 1951-2 C.B. at 488), Congress required in section 631(c) that taxpayers retain an economic interest in coal before its disposition qualifies for the subsidy provided. This petitioner has not done. Her arguments to the contrary are unavailing.

Petitioner argues that, unless other provisions of an agreement compel a different conclusion, a lessor entitled to tonnage royalties dependent upon the quantity of mineral extracted retains an economic interest in the mineral. See *Gitzinger v. United States*, 404 F.2d at 194. As discussed above, we think that the provisions of the instant contract compel a different conclusion, namely, our conclusion that petitioner did not retain an economic interest in the coal. Petitioner contends that the existence of a maximum on tonnage royalties payable does not necessarily preclude retention of an economic interest, citing *Kittle v. Commissioner*, 21 T.C. 79 (1953), affd. per curiam 229 F.2d 313 (9th Cir. 1956). That case is inapposite. In *Kittle v. Commissioner*, 21 T.C. at 88-89, we held that the taxpayer retained an economic interest in iron ore even though the lessee was obligated to pay the taxpayer $10 million over 20 years as minimum royalties even if the lease was subsequently terminated. This $10 million represented a 50-cent-per-ton royalty on the first 20 million tons of iron ore mined. If more iron ore was mined, the lessee was obligated to pay a royalty thereon at the 50-cent-per-ton rate. 21 T.C. at 87. Thus, the $10 million minimum royalty was not the maximum the taxpayer could receive in that case except in the case of default.

Petitioner's arguments do not overcome the total effect of the contract, which precludes petitioner from having retained an economic interest in the coal. The fact that the maximum tonnage royalties payable equal the total annual minimum royalties, in conjunction with the open-ended

recoupment provision, in effect fixes the consideration petitioner will receive under the contract at $4.3 million. She will receive this amount regardless of whether any coal is ever actually mined. Thus, she need not look to the extraction of the coal for a return of her capital and hence has not retained an economic interest in the coal.

Petitioner's alleged intent that the tonnage royalties would be her primary source of income is not controlling. It is the intent of *both* parties to an agreement that must be considered in determining whether an economic interest has been retained. *Gitzinger v. United States*, 404 F.2d at 195. The contract expressly provides that "the economic interest in and to the coal in, on and under the [property] for income tax and all other purposes shall be deemed, construed and shall be in [Wellmore]." While more than one party may hold an economic interest in mineral property (see *O'Connor v. Commissioner*, 78 T.C. at 8-9), and while this contract language in regard to the economic interest does not control our decision, it nevertheless appears to be a clear statement of the parties' intentions as to who owns the economic interest in the coal.

Petitioner also contends that she continued to participate in the risks of mining and therefore retained an economic interest in the coal. See *United States v. White*, 401 F.2d 610, 614 (10th Cir. 1968). Indeed, we have said that economic interest and risk are inextricably related. *O'Connor v. Commissioner*, 78 T.C. at 11. According to petitioner, she faces the possibility that, given the uncertain feast-or-famine nature of the Kentucky coal industry,[12] Wellmore may be unable to meet either its mining or payment obligations under the contract. Petitioner also claims to bear the risk of (1) the coal's somehow being destroyed before extraction, (2) Wellmore's "abandoning the job," (3) Wellmore's terminating the contract, and (4) Wellmore's shareholders bankrupting the corporation so as to avoid its obligations under the contract. Petitioner also waived any right to hold Wellmore liable for any damage, destruction, or nuisance that may occur during the mining operations. Even if these speculative claimed risks exist, they are risks that exist whenever one has a security interest in property

---

[12] The Kentucky coal industry was described by Combs, the attorney who negotiated and drafted the contract for petitioner, as a feast or famine business.

that has been sold outright. Risk that evidences the existence of an economic interest exists only when one must look solely to extraction of the mineral resource in order to recover an investment. *O'Connor v. Commissioner*, 78 T.C. at 11. The risks cited by petitioner are not related to extraction, but are risks one has with any outright sale of property where payments are to be made on the installment basis, as here.

Petitioner's argument that she should not be denied section 631(c) treatment because she "minimized" her risk by contracting for annual minimum royalties is likewise unconvincing. In negotiating the contract, petitioner *eliminated* the risk that she would not receive a return of her investment in the coal if the coal were not extracted. Under the contract, she will receive $4.3 million for the coal regardless of whether any coal is mined. She bears no risk dependent upon extraction.

Petitioner next argues that in a typical coal lease the lessor retains an economic interest in the coal, citing *Wood v. United States*, 377 F.2d at 305, and insists that her contract is a typical coal lease. Respondent concedes that the contract is a typical coal lease in that it contains the usual "boilerplate" lease provisions. In addressing petitioner's argument, we need not definitively define a typical coal lease and compare the contract thereto. See, however, *Wood v. United States*, 377 F.2d at 305-307, particularly n. 14. We must consider the total effect of the contract (see *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260, 266-267 (1958)), which is that petitioner will receive $4.3 million regardless of whether any coal is ever mined. Such a result precludes petitioner's retention of an economic interest and most certainly does not occur in the "typical" coal lease.

Finally, petitioner suggests that consideration of the time value of money leads to the conclusion that she retained an economic interest in the coal. She repeats her argument that the contract's annual minimum royalty, "diligent mining" requirement and recoupment provision encourage Wellmore to mine the coal as soon as possible.[13] Wellmore could have mined all the coal during the early years of the contract and consequently would have been required to pay petitioner the

---

[13] As noted earlier, we do not agree with this assertion.

$4.3 million as tonnage royalties as the coal was mined. Because of its immediate earning potential, $4.3 million paid during the early years of the contract would have been worth more to petitioner than $4.3 million paid as annual minimum royalties over 10 years. Petitioner could have received the $4.3 million in less than 10 years only if Wellmore had mined more coal than it had in effect paid for with previously paid annual minimum royalties and had to pay tonnage royalties in excess of the annual minimum royalty due for any particular year. Therefore, petitioner argues, she had to look to extraction of the coal for a return of her capital and thus retained an economic interest in the coal.

The fallacy in petitioner's argument is that the return *of* her capital is not dependent upon Wellmore's mining the coal. Under the contract, petitioner will receive $4.3 million over a period of 10 years regardless of whether the coal is mined. Petitioner may receive it sooner, depending on when the coal is mined, but she will nevertheless receive it. The return *on* petitioner's capital, that is, how much she can earn on the $4.3 million once she receives it, can vary depending on when the coal is mined, because the sooner petitioner receives it, the sooner she can invest it. Thus, although the value of the $4.3 million to petitioner as reflected in its earning power can be affected by extraction, petitioner's ultimate receipt of the $4.3 million is not in any way dependent upon extraction.[14] Therefore, she did not retain an economic interest in the coal.

---

[14] The only specific authority petitioner cites in support of her argument that we must consider the time value of money is the following language from *Filgo v. United States*, 387 F. Supp. 1300, 1309 (N.D. Texas 1974):

"The sole 'economic' distinction between a typical mineral lease and the 'agreements' in question here is that Texas Industries, Inc., the Grantee, lost the use of the $6,250 (an interest factor) from the time a $6,250 check for an 'increment' was delivered * * *"

Neither the case nor the quote has anything to do with any relationship between the time value of money and retention of an economic interest. In *Filgo*, the District Court determined that agreements providing for the extraction of sand, gravel, and fill dirt from the Filgos' property in large increments and also giving Texas Industries the option to purchase additional increments in effect gave Texas Industries the right to mine to exhaustion so that the Filgos retained an economic interest in the minerals in place and that the agreements were therefore leases and the payments received thereunder were minimum guaranteed advance royalties taxable as ordinary income. *Filgo v. United States*, 387 F. Supp. at 1304-1305. The decision rested in large part upon the option granted to Texas Industries to purchase additional increments of minerals. *Filgo v. United States*, 387 F. Supp. at 1304-1305. The language quoted by petitioner was simply an explanation that the only difference between the agreements in question and typical mineral leases was that Texas Industries was paying the

Respondent has argued throughout this proceeding, that because the maximum on tonnage royalties equals the total annual minimum royalties, the contract fixes a definite consideration ($4.3 million) that petitioner will receive regardless of whether any coal is mined. This precludes petitioner from retaining an economic interest in the coal, because she need not look to extraction for a return of her capital. In making her various arguments, petitioner has not, for the most part, directly addressed these clear consequences of the contract. Petitioner's only attempt in this regard is to suggest that the total amount of annual minimum royalties was determined by referring to the estimate that there were 4.3 million tons of recoverable coal in her property. Petitioner cites *Briscoe v. United States*, 210 Ct. Cl. 158, 536 F.2d 353 (1976), for the proposition that a minimum royalty based on an approximation of available reserves does not prevent the recipient from retaining an economic interest in the minerals in place. That is not the point. The contract sets a definite consideration petitioner will receive regardless of whether any coal is mined. This precludes petitioner's retention of an economic interest in the coal. As a number of commentators have warned: "A contractual right to receive a definite sum of money within a definite time, with interim payments measured by production, is not an economic interest, because the right to share in the [mineral] proceeds is incidental to the covenant to pay a sum certain." C. Russell & R. Bowhay, Income Taxation of Natural Resources, par. 2.12, at 213 (1986); Coggin, "Section 631(c): Disposal of Coal or Domestic Iron Ore with a Retained Economic Interest," 459 Tax Mgmt. A-4 (BNA 1984). See also *Vest v. Commissioner*, 481 F.2d 238, 243 (5th Cir. 1973), cert. denied 414

Filgos minimum guaranteed royalties in advance of actual extraction. A reading of the entire paragraph from which petitioner selectively quotes confirms this interpretation:

"4. The total effect of the agreements here is that Texas Industries, Inc., agreed to pay minimum guaranteed royalties, albeit, in advance and in large units (25,000 cubic yards), for sand and gravel to be removed from the land by Texas Industries in the ordinary course of mining operations. The sole 'economic' distinction between a typical mineral lease and the 'agreements' in question here is that Texas Industries, Inc., the Grantee, lost the use of the $6,250 (an interest factor) from the time a $6,250 check for an 'increment' was delivered to Lee Filgo until the 25,000th cubic yard of sand and gravel in that increment was removed from the 168-acre tract. [*Filgo v. United States*, 387 F. Supp. at 1309.]"

This distinction was not determinative. *Filgo v. United States*, 387 F. Supp. at 1310.

U.S. 1092 (1973). After considering all of the facts of this case and reviewing petitioner's contract as a whole in the light of the pertinent case law, we conclude that petitioner did not retain an economic interest in the coal.

Having decided that petitioner did not retain an economic interest in the coal and is therefore not entitled to section 631(c) treatment, we next consider respondent's argument that because section 631(c) does not apply, the payments under the contract are subject to the imputed interest rules of section 483.[15] See sec. 483(b) and (c). Petitioner has focused only on the section 631(c) issue.[16] She has not addressed the applicability of section 483 if section 631(c) treatment is unavailable.[17] We could therefore deem peti-

---

[15] During 1980, sec. 483 provided in pertinent part as follows:

SEC. 483. INTEREST ON CERTAIN DEFERRED PAYMENTS.

(a) AMOUNT CONSTITUTING INTEREST.—For purposes of this title, in the case of any contract for the sale or exchange of property there shall be treated as interest that part of a payment to which this section applies which bears the same ratio to the amount of such payment as the total unstated interest under such contract bears to the total of the payments to which this section applies which are due under such contract.

(b) TOTAL UNSTATED INTEREST.—For purposes of this section, the term "total unstated interest" means, with respect to a contract for the sale or exchange of property, an amount equal to the excess of—

(1) the sum of the payments to which this section applies which are due under the contract, over

(2) the sum of the present values of such payments and the present values of any interest payments due under the contract.

For purposes of paragraph (2), the present value of the payment shall be determined, as of the date of the sale or exchange, by discounting such payment at the rate, and in the manner, provided in regulations prescribed by the Secretary. Such regulations shall provide for discounting on the basis of 6-month brackets and shall provide that the present value of any interest payment due not more than 6 months after the date of the sale or exchange is an amount equal to 100 percent of such payment.

(c) PAYMENTS TO WHICH SECTION APPLIES.—

(1) IN GENERAL.—Except as provided in subsection (f), this section shall apply to any payment on account of the sale or exchange of property which constitutes part or all of the sales price and which is due more than 6 months after the date of such sale or exchange under a contract—

(A) under which some or all of the payments are due more than one year after the date of such sale or exchange, and

(B) under which, using a rate provided by regulations prescribed by the Secretary for purposes of this subparagraph, there is total unstated interest.

Any rate prescribed for determining whether there is total unstated interest for purposes of subparagraph (B) shall be at least one percentage point lower than the rate prescribed for purposes of subsection (b)(2).

[16] As noted above, if a transaction qualifies for sec. 631(c) treatment, sec. 483 does not apply. H. Rept. 749, 88th Cong., lst Sess. (1963), 1964-1 C.B. (Part 2) 125, 198. See secs. 1.483-1(b)(1), 1.631-3(b)(1), and 1.631-3(c)(1), Income Tax Regs.

[17] In her reply brief, petitioner for the first time and in a rather strident tone contends that the notice of deficiency is arbitrary, excessive, and incorrect because of "Respondent's failure to abide by the Treasury Regulations (sec. 1.631-3(c)(1)(i), Income Tax Regs.) and the legislative intent underlying sec. 631(c) and as a result of its [sic] steadfast refusal to offer

tioner to have conceded the issue. However, assuming petitioner has not conceded the issue, we think it clear that section 483 applies to payments petitioner received under the contract, given our holding that the payments do not qualify for section 631(c) treatment.

In general, during 1980, section 483 applied to any payment on account of a sale or exchange of property due more than 6 months after the date of the sale or exchange under a contract under which (1) at least one payment is due more than 1 year after the date of the sale or exchange and (2) there is total unstated interest under section 483(b). Sec. 483(c). The transaction evidenced by the contract was a sale or exchange of property not coming within section 631(c) because petitioner did not retain an economic interest in the coal. See *O'Connor v. Commissioner*, 78 T.C. 1, 12 (1982). Therefore, the payments petitioner receives under the contract are on account of an outright sale or exchange of property, specifically a sale of a capital asset as defined in section 1221. At least one payment is due under the contract more than 1 year after its date. In fact, all of the annual minimum royalties are due more than 1 year after the date of the contract. In addition, all of the coal could be mined in 4 years, so even if all the coal had been mined

evidence or to acknowledge the existence of certain provisions of the Coal Lease." Petitioner further argues that she has presented sufficient evidence to rebut the presumption of correctness that usually attaches to the notice of deficiency. Thus, she says, respondent bears the burden of proving the existence of a deficiency, which he has failed to satisfy because he has presented no evidence at all. Petitioner's arguments and the cases she cites are completely inapposite. See *Kenyatta Corp. v. Commissioner*, 86 T.C. 171, 179-181 (1986).

This case does not depend upon which party bears the burden of proof or upon the availability of the presumption of correctness. Our primary task here is to apply a rather basic tax concept (i.e., retention of an economic interest) to relatively straightforward facts revolving around a contract stipulated into evidence. Such an exercise does not involve weighing whether one party or the other has satisfied the burden of proof in offering evidence or convincing us that his or her version of the facts (as opposed to the legal consequences thereof) is the correct one. Moreover, we think the record contains all the facts necessary to our determination. The fact that petitioner rather than respondent supplied most of the evidence is not only irrelevant but hardly astonishing since she and her advisers possessed the documents and knowledge relevant to the transaction. Respondent's arguments in support of the inapplicability of sec. 631(c) and his emphasis on provisions of the contract favorable to his position do not make the statutory notice arbitrary, excessive, and incorrect. Petitioner even suggests that respondent "affirms that the Notice of Deficiency is, in fact, incorrect and excessive, arguing that Petitioner's tax liability should be recomputed using a new theory of the payments under the Coal Lease." The "new theory" is simply another method of computing the imputed interest under section 483, which respondent says would result in a lower deficiency for petitioner; the Court will not force petitioner to accept the benefit of this recomputation if she does not wish it. See note 18 *infra*. In short, petitioner's arguments in regard to burden of proof and the notice of deficiency are not only presented in an intemperate manner, but are simply wrong.

right after the contract was signed, at least some of the tonnage royalties would have been paid more than 1 year after the contract date. There is total unstated interest because the contract does not provide for any interest. See sec. 483(b); sec. 1.483-1(d), especially (d)(2), Income Tax Regs. Finally, none of the exceptions to section 483 apply. See sec. 483(f); sec. 1.483-2(b), Income Tax Regs. Thus, section 483 applies.

We sustain respondent's determination that $129,688.86 of the payment petitioner received under the contract during 1980 is ordinary interest income.[18]

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[18]On brief, respondent suggests that the payments petitioner receives under the contract are indefinite within the meaning of sec. 483(d), and that the interest portion of each payment should therefore be calculated under sec. 1.483-1(e), Income Tax Regs. We will not consider matters first raised on brief. See *Neely v. Commissioner,* 85 T.C. 934, 943-944 (1985). However, this does not seem to be so much a new matter or even a change of legal theory as merely another method to compute the amount of imputed interest under sec. 483. Since respondent indicates that such a calculation will result in a reduced deficiency, presumably interest income in an amount less than the $129,688.86, we will permit the parties, if they so desire, to recompute the deficiency if that can be accomplished on the record of this case and under Rule 155. The Court expresses no view as to the computation of such payments in subsequent tax years.