**Ruben MARTINEZ, Plaintiff–Appellant,**

v.

**PACIFIC INDUSTRIAL SERVICE CORPORATION; Weatherford U.S., Inc., Defendants–Appellees.**

No. 89–55213.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 1, 1990.

Decided June 1, 1990.

As Amended on Denial of Rehearing Aug. 30, 1990.

Preston Easley, San Pedro, Cal., for plaintiff-appellant.

Roy G. Weatherup, Haight, Dickson, Brown & Bonesteel, Santa Monica, Cal., and Ladell Hulett Muhlestein, Chase, Rotchford, Drukker & Bogust, Los Angeles, Cal., for defendants-appellees.

Before BROWNING, NOONAN, and FERNANDEZ, Circuit Judges.

NOONAN, Circuit Judge:

Ruben Martinez brought an action in admiralty against Pacific Industrial Service

---

Corp. (Pacific) and Weatherford U.S., Inc. (Weatherford) for injuries he sustained in cleaning boiler tubes aboard the *U.S.S. Ajax* with hydroblast equipment. The district court granted summary judgment for the defendants on the ground that admiralty jurisdiction was lacking. Martinez appealed. We reverse and remand.

## FACTS

On July 13, 1983, the *U.S.S. Ajax,* a ship of the United States Navy, was pierside in navigable waters at the 32nd Street Naval Station in San Diego. Its crew kept watches aboard the vessel. It was on the third day of preparation for what would be a ten month overhaul and had not yet gone into drydock.

The general contractor for the overhaul was Triple "A" South. Cleaning Dynamics Corporation was awarded a subcontract by Triple "A" to clean the boiler tubes of the *Ajax.* Martinez was employed by Cleaning Dynamics for this purpose.

The cleaning of boiler tubes uses two hydroblast pumps. The water pump remains on the pier. It pumps water that flows up to 20 gallons per minute at pressures up to 10,000 pounds per square inch. The hose is fed from this pump to a trigger gun operated from the deck of the ship. The trigger operator can release water through a dump valve in the trigger gun or through a cleaning lance attached to the end of the trigger gun. The cleaning lance is inserted into a boiler tube by an operator who then signals the trigger operator to release the water. The water escapes through holes in the cleaning lance and propels the lance forward through the boiler tube.

On July 13, 1983 Martinez was aboard the *Ajax* cleaning its tubes by inserting the cleaning lance. He had successfully repeated the operation for the first half of the shift. He inserted the lance into a boiler tube and signalled to the trigger operator to pull the trigger. Water was propelled through the lance, and the lance, feeding out water under pressure, came out of the tube and struck Martinez in the knee causing an injury.

The pump that allegedly caused the injury was manufactured by Weatherford. This kind of pump had been developed for cleaning heat exchangers, tubes and pipes in the oil industry. It has been used by the Navy for cleaning boilers on ships since the late 1970's. It is generally operated by specially trained shore-based contractors and not by ship personnel. The pump in question in this case had been rented from Pacific. It was manufactured by Weatherford.

## PROCEEDINGS

On March 31, 1986 Martinez brought this action against Pacific, claiming negligence in the operation of the pump. Martinez' complaint was amended May 16, 1988 to include Weatherford, alleging negligence in the manufacture of the pump.

On February 1, 1989 the district court granted the motions for summary judgment of Pacific and Weatherford. The basis for the judgment was want of admiralty jurisdiction. Martinez appealed.

## ANALYSIS

■ Our starting point is *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). Prior to that date, admiralty jurisdiction had depended on whether the act complained of had occurred on navigable waters. The rule had been much criticized because it permitted such curious results as one swimmer suing another in admiralty for an injury occurring off a public beach. *See id.* at 255–56 & n. 5, 93 S.Ct. at 498 & n. 5. It had also been observed that Congress had been compelled by statute to enlarge admiralty jurisdiction where "the tort has no maritime locality, but does bear a relationship to maritime service, commerce, or navigation." *Id.* at 259–60, 93 S.Ct. at 500–01 (citing the Jones Act permitting recovery for injury to a seaman on land; also referring to the doctrine of unseaworthiness which "has been extended to

permit a seaman or a longshoreman to recover from a shipowner for injuries sustained wholly on land, so long as those injuries were caused by defects in the ship or its gear"; and citing to the Extension of Admiralty Jurisdiction Act, 46 U.S.C.App. § 740, extending admiralty jurisdiction to all cases of injury caused by a vessel on navigable waters although the injury was done or consummated on land).

*Executive Jet* laid out the law in particular as to admiralty jurisdiction where a plane crashed and sank in navigable waters. The plaintiffs in the case contended for a rule where the sinking of the plane in such waters would confer jurisdiction. The Court refined the locality test and held: "It is far more consistent with the history and purpose of admiralty to require also that the wrong bear a significant relationship to traditional maritime activity." *Id.* at 268, 93 S.Ct. at 504.

The Court then went on to explore "what constitutes, in the context of aviation, a significant relationship to traditional maritime activity." *Id.* The court discussed what admiralty law had traditionally dealt with. Among the factors of relevance to the present case was seaworthiness. *Id.* at 270, 93 S.Ct. at 505. It concluded that the rules and concepts of the sea were "wholly alien to air commerce." *Id.* The Court declared that there was no jurisdiction in *Executive Jet* when the plane in question had been flying from Cleveland to Portland, Maine and its connection with navigable waters was only fortuitous and incidental. *Id.* at 272–73, 93 S.Ct. at 506–07.

In the light of *Executive Jet*, this court has decided questions of admiralty jurisdiction, noting that for jurisdiction to lie "the tort must also arise in the course of a traditional maritime activity." *Owens–Illinois, Inc. v. United States Dist. Ct.*, 698 F.2d 967, 970 (9th Cir.1983). As a way of determining whether there was a significant relation to a traditional maritime activity, the court looked first at "traditional concepts of the role of admiralty law." *Id.* at 970. To do so it found helpful the reasoning in the many cases dealing with whether a particular contract dispute was

in admiralty. It noted that when a contract "relates to the repair or navigation of a vessel, a dispute arising from the contract lies within admiralty jurisdiction" and that was true whether the vessel being repaired was afloat, in dry dock, or laid up on land. *Id.* On the other hand where the contract concerned the construction of a vessel, admiralty jurisdiction was lacking. In *Owens–Illinois* where the plaintiff had worked on asbestos products in the boiler room of ships under construction, the plaintiff failed to meet this test.

The second factor considered in *Owens–Illinois* was "the function and role of the parties." *Id.* The plaintiff also failed to meet this factor because he had worked only on the installation of asbestos, an activity not normally engaged in by seamen. The court mentioned two other factors to be considered in deciding the ultimate question of whether the tort arose in the course of traditional maritime activity: "the types of vehicles and instrumentalities involved" and "the causation and nature of the injury suffered." *Id.* As to the third factor it observed that, while ships were obviously involved, the tools and safety equipment of the asbestos installer possessed "few maritime attributes." *Id.* at 971. Finally, the nature of the injury, disease from asbestos, and its causation, inhalation of asbestos fibers, had "little maritime connection" because they were related to the construction taking place on land. *Id.*

In *Myhran v. Johns–Manville Corp.*, 741 F.2d 1119 (9th Cir.1984), another asbestos case, this court stated the distinction between the repair of a ship and the construction of a ship "alone cannot be determinative," although the distinction was "relevant to the inquiry required by *Executive Jet.*" *Id.* at 1121–22. The broad question, to which this inquiry was subsidiary, however, was, the court declared repeating *Owens–Illinois*, whether the tort bore "a significant relationship to traditional maritime activity." *Id.* at 1122.

In *Myhran* the issues presented were "identical to those presented in countless other asbestos suits." *Id.* quoting *Harville v. Johns–Manville Prods. Corp.*, 731

F.2d 775, 786 (11th Cir.1984). Plaintiff was "not a seaman, nor did he perform work traditionally done by seamen." *Id.* He was a pipefitter, following a trade linked more with the land than with the sea. In that respect he was different from a stevedore who was entitled to seaman's protection because he did "a seaman's work." *Id.* (citing *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 99, 66 S.Ct. 872, 879, 90 L.Ed. 1099 (1946)). Finally, the involvement of a ship with the plaintiff's claim was at most tangential. His claim would have been "exactly the same if all of his exposure to asbestos occurred during the construction of ships or during the construction or repair of buildings on land." *Id.* at 1122.

The Supreme Court and this court have eliminated from admiralty the kind of case where a literal insistence that an incident occurred in navigable waters led to an absurd expansion of jurisdiction: the accident of swimmers off an ocean beach; the crash of a plane taking off from Cleveland; the asbestos installation on a ship. The encounter of two swimmers has nothing to do with navigation or with seamen. The crash of a plane on take-off has nothing to do with ships. Asbestos installation has no traditional maritime function. An injury from asbestos has no relationship to "maritime activity." *Myhran v. Johns–Manville Corp.*, 741 F.2d at 1122.

Martinez is not a swimmer. The *Ajax* is not a plane. Boiler-cleaning is not asbestos installation nor asbestos removal. The case presented by Martinez falls well within the scope of seaman's work. Cleaning the boilers of a ship is a traditional maritime activity. The fact that it is now done by hydroblast does not alter its essential character. The case is exactly analogous to that of the stevedore whose right to sue in admiralty was upheld in the landmark case of *Atlantic Transport Co. v. Imbrovek*, 234 U.S. 52, 34 S.Ct. 733, 58 L.Ed. 1208 (1914). Once upon a time the work of loading and stowing a ship's cargo was done by the ship's crew. But "owing to the exigencies of increasing commerce and the demand for rapidity and special skill, it has become a specialized service devolving upon a class 'as clearly identified with maritime affairs as are the mariners.' " *Id.* at 62, 34 S.Ct. at 735 (quoting *The George T. Kemp*, 2 Lowell, 477, 482). *Atlantic Transport Co.* is decisive authority that in determining what is traditionally seaman's work one looks at what was done in the past, not at innovations. Hydroblasting is a special, rapid, modern way of doing a tedious, familiar seaman's job.

It is objected that Martinez was not part of any ship's crew. Neither, of course, is any stevedore part of a ship's crew. Moreover, Martinez had been doing hydroblasting on ships of the United States Navy for the past four years. He was not attached to a particular ship. He was attached to service to the fleets of the Navy.

Again, in terms of the traditional function of admiralty law, Martinez was engaged in work that was both routinely and essentially necessary to the operation of the vessel. His work met the repair test, which is relevant although not decisive. His work, however, was more than "repair." It was work that had to be done as part of the rhythm of maintaining the ship as a functioning vehicle. Admiralty law is concerned with what keeps a ship in good working order.

Unlike the asbestos-installer or the pipefitter removing asbestos, what Martinez did was work traditionally linked with the sea. The fact that hydroblasting was also performed in the oil industry does not in the least detract from the traditional connection of boiler-cleaning to the operation of vessels at sea. The hydroblast pump itself was a instrumentality capable of being used on land as well as at sea, but it was used with a manual that was specially prepared for the Navy. The vehicles involved were, of course, ships.

▮ The injury was allegedly caused by a malfunction of the pump, the failure of a product. But as explicitly pointed out in *Owens–Illinois*, a products liability claim may be heard in admiralty if the injury occurs on navigable waters and the other factors pointing to admiralty jurisdiction exist. *Owens–Illinois*, 698 F.2d at 971 (citing *Jones v. Bender Welding & Mach.*

*Works, Inc.*, 581 F.2d 1331, 1337 (9th Cir. 1978)); *see also Simpson Timber Co. v. Parks*, 369 F.2d 324 (9th Cir.1966), *vacated and remanded*, 388 U.S. 459, 87 S.Ct. 2115, 18 L.Ed.2d 1319 (1967), *on remand*, 390 F.2d 353 (9th Cir.) (implicit Supreme Court approval of admiralty's acceptance of land based products liability law), *cert. denied*, 393 U.S. 858, 89 S.Ct. 126, 21 L.Ed.2d 127 (1968). Despite a vigorous dissent, the Supreme Court has made clear that there is a broad federal interest in protecting maritime activity. *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 675, 102 S.Ct. 2654, 2658, 73 L.Ed.2d 300 (1982).

To sum up, Martinez was injured on navigable waters performing work traditionally performed by seamen. He had performed such work for four years in the course of attachment to the United States Navy, using equipment with an operations manual designed for use by the Navy. His work bore directly on the function of a vessel and had an intimate connection with maritime commerce. Admiralty jurisdiction exists.

In reaching this conclusion we agree with the Fifth Circuit in *Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457, 469 (5th Cir. 1976). That case involved the death of a shore-based tank cleaner who was killed when he was overcome by noxious fumes while cleaning tanks aboard a barge by means of a shoreside vacuum truck. The Fifth Circuit held that the plaintiff in that case, although using a shoreside source of suction, "was engaged in precisely the type of cargo tank stripping that a seaman could ordinarily perform." *Id.* at 471. The Fifth Circuit's analysis of what constitutes doing a seaman's work converges with our analysis and lends it powerful support. Moreover, once the injury is shown to affect a person doing seaman's work there is, as the Fifth Circuit said in *Woessner v. Johns–Manville Sales Corp.*, 757 F.2d 634, 643 (5th Cir.1985), a strong suggestion "that the wrong bears a significant relationship to traditional maritime activity" which will "counsel strongly in favor of exercising admiralty jurisdiction." Still, the analysis does not end there for "where neither the defendant, the injury, nor the

instrumentality of the injury has any particular connection to maritime navigation or commerce, other concerns such as the demands of federalism may override." *Id.* As we have shown, those concerns are no impediment to jurisdiction in this case. Martinez is entitled to seek succor from the law of admiralty.

REVERSED and REMANDED.