T.C. Memo. 2015-244

UNITED STATES TAX COURT

JEREMIAH J. O'CONNOR AND MARY K. O'CONNOR, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5403-08.               Filed December 16, 2015.

In 1998, P-H's wholly owned S corporation, H, became a participating employer in the A Plan, which purported to be a "10 or more employer" welfare benefit plan under I.R.C. sec. 419A(f)(6), providing death benefits to selected employees of an employer participating in the plan. To fund the death benefits for covered employees, each participating employer made cash contributions to a trust associated with the A Plan, which, by and through the plan trustee, used the cash to fund premiums for a life insurance policy on the life of each covered employee. The trustee was both owner and beneficiary of the policies.

In September 2002, B, the plan administrator, advised employer participants that, under anticipated final IRS regulations, they would lose their deductions for payments to fund insurance policy premiums under the A Plan and that it intended to terminate the A Plan in 2003. In October and November 2002, P-H, on behalf of H, attempted, unsuccessfully, to terminate H's participation in the A Plan and have the policy on P-H's life transferred directly from the

[*2]  A Plan to the BS Plan, a separate I.R.C. sec. 419A(f)(6) welfare benefit plan.

On several occasions during 2003, B advised H to voluntarily terminate its participation in the A Plan, which, under the terms of the plan, would entail a distribution of the policies to covered employees, taxation of each employee on the net cash surrender value of his or her policy, and the employee's transfer of the policy to a new plan.  B stated that it could not allow a direct transfer of an insurance policy from it to another plan administrator.

Pursuant to that advice, in October 2003, H executed a corporate resolution terminating its participation in the A Plan.  After receiving that resolution, B, on October 29, 2003, mailed to P-H a transfer of policy ownership form, signed by the trustee under the A Plan as the "Old Owner" of P-H's policy, and a blank change of beneficiary designation form.  On November 11, 2003, a representative of the BS Plan signed the transfer of policy ownership form as the "New Owner" of the policy.  The actual transfer of the policy did not occur until January 2004.

Ps argue that (1) they could not have received taxable income with respect to the policy transfer any earlier than 2004 when P-H's policy was actually transferred to the BS Plan and (2) that transfer was exempt from tax under I.R.C. sec. 1035, which provides for nonrecognition of gain on an exchange of life insurance policies.  R argues that (1) Ps were taxable in 2003 under I.R.C. sec. 402(b)(1) or (2), either when H terminated its participation in the A Plan or when B provided to P-H the transfer of policy ownership form signed by the A Plan trustee, which allowed P-H to either retain the policy or transfer it to a new owner, and (2) I.R.C. sec. 1035 is inapplicable because there was no exchange of policies.  R also seeks to impose a 20% substantial understatement penalty under I.R.C. sec. 6662(a).

1. <u>Held</u>:  Ps are taxable, under I.R.C. sec. 402(b)(1), on the net cash or "accumulation" value of P-H's policy in 2003, either when H terminated its participation in the A Plan or when B provided to P-H

**[\*3]** the transfer of policy ownership form signed by the A Plan trustee. Gluckman v. Commissioner, T.C. Memo. 2012-329, aff'd, 545 F. App'x 59 (2d Cir. 2013), followed.

      2. Held, further, I.R.C. sec. 1035 is inapplicable because there was no exchange of life insurance policies.

      3. Held, further, I.R.C. sec. 6662(a) penalty sustained.

Ira B. Stechel, for petitioners.

Brian J. Bilheimer, Brian E. Derdowski, Jr., and Eugene A. Kornel, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge: By notice of deficiency (notice), respondent determined a $142,416 deficiency and a $28,483 accuracy-related penalty with respect to petitioners' 2003 Federal income tax.[1] Respondent's principal adjustment is a $395,051 increase in petitioners' income for 2003. The issues for decision are (1) whether petitioners received taxable income in 2003 with respect to a cash

---

[1]Unless otherwise stated, all section references are to the Internal Revenue Code in effect for 2003, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts have been rounded to the nearest dollar.

[*4] value life insurance policy on Mr. O'Connor's life held by a trust administered under a plan known as the Advantage Death Benefit Plan (Advantage Plan) sponsored and administered by BISYS Insurance Services, Inc. (BISYS), and (2) if so, whether petitioners are liable for the accuracy-related penalty under section 6662(a).[2]

## FINDINGS OF FACT

This case was submitted fully stipulated under Rule 122. Petitioners resided in Massachusetts when they filed their petition.

Petitioners, who are married, timely filed their joint Federal income tax return for 2003 on April 13, 2004. Petitioner Jeremiah J. O'Connor was an employee of his wholly owned S corporation,[3] J.P. O'Connor Hardware, Inc. (Hardware), throughout the relevant periods discussed herein. It is Hardware's participation in and withdrawal from the Advantage Plan that gives rise to the issues in this case.

---

[2]The notice also reflects a $63,156 reduction in petitioners' itemized deductions for 2003, which derives from the principal adjustment and is not directly disputed by petitioners.

[3]The term "S corporation" is defined in sec. 1361(a)(1). In general, an S corporation has no Federal income tax liability, and its items of income, deduction, credit, and such are passed through (i.e., taken into account by its shareholders). See secs. 1363(a), 1366(a).

**[*5]** <u>The Advantage Plan</u>

The Advantage Plan purported to be a "10-or-more-employer" welfare benefit plan under section 419A(f)(6) providing death benefits to selected employees of an employer participating in the plan. The Advantage Plan was created in 1996 and, beginning in 2001, was administered by BISYS. In order to fund the death benefits for covered employees, each participating employer made cash contributions to the trust associated with the Advantage Plan, which, by and through the plan trustee, used the cash received to fund premiums for a life insurance policy on the life of each covered employee.[4] The life insurance policy obtained on the life of each covered employee provided a death benefit in an amount equal to the death benefit provided in the Adoption Agreement executed by the employee's employer. Under the terms of the Advantage Plan, the plan trustee was both the owner and the beneficiary of the life insurance policy for a covered employee. The Advantage Plan did not allow any reversion of plan assets to a participating employer.

Article VI of the Advantage Plan document, entitled "Distribution of Benefits", provides as follows:

---

[4]The Advantage Plan trust was never a tax-exempt trust.

Section 6.01: <u>Events Permitting Distribution</u>. The Trustee shall, upon advice of the Plan Sponsor, within a reasonable period of time after notice, make a complete distribution of a Covered Employee's or Participant's interest or commence to distribute such interest upon:

(1)    Notification by Employer of entitlement to death benefits by Covered Employee or Participant, together with death certificate and other materials required by Plan Sponsor, or

(2)    Discontinuance of the Plan, termination, or partial termination of the Trust.

The Covered Employee or Participant may purchase, upon termination of employment, or an event described in Subsection 6.01(2) above, from the Trustee the benefits provided hereunder, if transferable under applicable law. The purchase price for the benefits shall be the amount set forth under Section 5.07. The Trustee shall take all necessary steps to facilitate the purchase by the Covered Employee or Participant during the thirty (30) day period following termination of employment or event described in Subsection 6.01(2) above. During such thirty day period, all Beneficiary designations shall remain in full force and effect. In the event the Insured does not elect to acquire such coverage, the Trustee may surrender such policy to the Insurer. The proceeds from the sale or surrender of the policy shall be added to the Trust Fund and allocated among Participants in proportion to each Participant's then current salary as compared to all Participants' salaries. In the event such Insured does not elect to acquire any insurance policy and dies prior to the surrendering of the policy by the Trustee but after the expiration of the thirty-day option period, the Trustee shall become the beneficiary and the death proceeds thereof shall be added to the Trust Fund.

Section 6.02: <u>Manner of Distributing Interests</u>. Payment of such benefits may be either:

**[*7]**    (a)    Payment directly to the Covered Employee or Participant;

(b)    Payment to other individual or entity for benefit of the Covered Employee or Participant at the direction of the Plan Sponsor.

(c)    Upon an Employer's determination to discontinue participation in the Plan, the Plan Sponsor shall retain an actuary to determine that there are sufficient benefits remaining in the Plan to meet the Trust's benefit requirements.  If those liabilities have been currently met, then the Trustee is permitted to distribute policies to the Covered Employees of the Employer.  If the Actuary retained by the Plan Sponsor and/or Trustee determines that there are insufficient assets to meet the current liability, then there shall be no distribution to the Covered Employees of the withdrawing Employer.  Terminating distribution shall be in-kind or in cash.  If in-kind, such distributions may take the form of the cash value life insurance policies maintained by the Trust on the life of the Covered Employees who shall receive the terminating distribution.

Article VII of the Advantage Plan document, entitled "Miscellaneous Provisions", provides, in pertinent part, as follows:

Section 7.01:  <u>Amendment or Termination</u>.  The Plan Sponsor reserves the right to retroactively or prospectively modify, alter, amend or terminate this Plan or the Trust, at any time, by an instrument in writing to be duly executed and delivered to the Trustee, in the case of the Trust, and that any such instrument shall not revest in the Employer any corpus or income of the Trust.  No modification, amendment or termination of the Plan shall be construed a termination of the Trust so as to require the Trustee to make a distribution of the Trust assets to any Covered Employee or

**[*8]** Participant, except in accordance with Article VI, unless the instrument expressly so provides. Upon Employer termination under 6.02, policies may be distributed to Covered Employees or successor Plans providing similar benefits.

\*     \*     \*     \*     \*     \*     \*

Section 7.08: <u>Employer's Right to Terminate</u>. Each Employer hereby reserves the right to terminate its participation in the Plan, at any time. An Employer's termination of participation in the Plan shall be evidenced by a certified copy of the resolution of the Employer authorizing such termination, which shall be filed with the Plan Sponsor at least sixty (60) days prior to the effective date thereof or such lesser time as may be agreed to by the Plan Sponsor. Termination of an Employers participation in the Plan shall be effective upon the date specified in such instrument but such termination shall not vest in the Employer any right, title or interest in or to the funds held hereunder nor shall termination by one Employer affect the participation in the Plan by an other Employer. Upon termination by an Employer of its participation in the Plan, the Plan Sponsor shall request the Trustee to perform a valuation of the Trust. The Plan Sponsor, based upon such valuation, shall determine (i) the portion of the Trust Fund attributable to benefits funded by the terminating Employer, and (ii) the balance of said portion remaining after provision for payment of the proportionate amount of Trust expenses and liabilities attributable to the terminating Employer. After satisfaction of the above expenses and liabilities, the Trustee shall offer the policies of insurance then held by it to the Covered Employees on whose lives the policies were issued in the manner provided in Section 5.07. Assets then remaining shall be distributed among all the then living Covered Employees of the Employer, who were employed by the Terminating Employer within the two-year period immediately preceding the date of termination, in the same ratio that each said Covered Employees total Compensation received during the Employees participation in the Plan is of the total Compensation received by all said Covered Employees. If there shall be no Covered Employees employed by the Employer within the

[*9]  above-described two-year period, then living, the remaining excess assets shall be treated as an experience gain.

Section 5.07, referenced in both sections 6.01 and 7.08 of the Advantage Plan document, gives a covered employee the right "to purchase the insurance policy obtained by the Trustee to provide the death benefit" for "an amount equal to the net cash surrender value of the policy."

Hardware's Participation in and Termination of Its Participation in the Advantage Plan

Hardware became a participating employer in the Advantage Plan when it adopted the plan pursuant to its execution of an "Advantage Death Benefit Plan Adoption Agreement" on September 21, 1998.  Mr. O'Connor, through Hardware, became a covered employee in the Advantage Plan on October 2, 1998. Thereafter, on October 5, 1998, a life insurance policy insuring Mr. O'Connor's life (O'Connor policy) was selected and obtained from Jefferson Pilot Financial Insurance Co. (Jefferson Pilot).  All premiums on the O'Connor policy were funded through contributions to the trust by Hardware.

By letter dated September 20, 2002, BISYS advised employer participants in the Advantage Plan, including Hardware, of enhanced risks that the Internal Revenue Service (IRS), on audit, would challenge the deductibility of the amounts paid to fund premium payments under the plan, and it offered the participating

[*10] employers an opportunity to purchase a Fiduciary Audit Protection Insurance Policy. BISYS also advised that "[p]ending final [IRS] regulations," it intended to terminate the Advantage Plan early in 2003. Shortly thereafter, on October 2, 2002, Mr. O'Connor, in his capacity as a member of Hardware's board of directors, executed a "Resolution To Be Adopted By Unanimous Written Consent of Directors", in which it was resolved that (1) the Advantage Plan be "terminated" and the "existing Plan Benefit" be transferred "to another 419A(f)(6) Sponsor and Trustee" and (2) Hardware's officers be "authorized and directed to execute all documents * * * necessary to effectuate" said termination and transfer. Thereafter, on October 16, 2002, Mr. O'Connor, on behalf of Hardware, executed a "Certificate of Resolution" to adopt and fund benefits for certain [Hardware] employees" through "the BENISTAR 419 Plan & Trust" (Benistar Plan) described therein as "a Multiple Employer Welfare Benefit Fund * * * under * * * [section 419A(f)(6)]". On October 16, 2002, Mr. O'Connor, on behalf of Hardware, executed an "Adoption Agreement", pursuant to which Hardware purported to adopt, join, and agree to participate in the Benistar Plan. On October 30, 2002, Jacqueline Campbell, a BISYS employee, mailed to Kathleen Kehoe, apparently a Benistar Plan employee, transfer of ownership forms for Hardware and a trustee transfer agreement form, which provided that Hardware and the Benistar Plan

[*11] would indemnify BISYS and the Advantage Plan from any damages or costs "arising out of or relating to * * * [Hardware's] participation in the Advantage Plan". On November 12, 2002, Daniel E. Carpenter, on behalf of the Benistar Plan, signed the transfer of ownership form transferring the O'Connor policy to "Benistar Admin. Services" as the "New Owner" of the policy. The form was not signed by anyone on behalf of BISYS as the "Old Owner" of the O'Connor policy. Mr. Carpenter, as trustee of the Benistar Plan, was unwilling to sign the trustee transfer agreement with the above-described indemnification clause. That refusal delayed the actual transfer of the O'Connor policy from the Advantage Plan to the Benistar Plan until January 2004, when Jefferson Pilot confirmed that it had recorded on its books that the trust under the Benistar Plan was the new owner of the policy.

In a letter dated January 20, 2003 (purportedly sent to all insurance sellers and agents), BISYS stated that (1) it expected the proposed regulations issued in 2002 to be finalized "substantially as proposed", (2) because of the resulting adverse tax effects on the Advantage Plan, it would no longer accept contributions to the plan after December 31, 2002, and (3) all employers' participation in the plan "must terminate by the later of December 31, 2003, or the date the IRS

[*12] finalizes the proposed regulations".[5]  The letter then states:

> Therefore, employers should consider taking steps to voluntarily terminate their participation in The Advantage Plan before December 31, 2003 and electing one of the alternatives outlined below. Otherwise, after December 31, 2003, an employer's participation in The Advantage Plan will automatically terminate, resulting in the surrender of any policies remaining in the Trust, a reallocation of the cash surrender values, and a distribution of the assets to participants. Any employer that has not voluntarily terminated its participation in The Advantage Plan on or before December 31, 2003 will not have the option of electing one of the alternatives outlined below.
>
> Alternative One--Employees Retain Policies
>
>> First, the employer terminates its participation in The Advantage Plan.  Second, the policies' cash surrender values are reallocated in accordance with The Advantage Plan document.  Third, the policies are rolled-out to the employees and the employees are taxed on the reallocated net cash surrender value.
>
> Alternative Two--Employer Adopts The Advantage DBO Plan
>
>> First, the employer terminates its participation in The Advantage Plan.  Second, the policies' cash surrender values are reallocated in accordance with The Advantage Plan document.  Third, the policies are rolled-out to the employees and the employees are taxed on the reallocated net cash surrender value.  Fourth, the employer adopts The Advantage DBO Plan and the rolled-out policies may be used as a funding vehicle for The Advantage DBO Plan ("The DBO Plan" or "The New Plan").  We have attached a fact sheet regarding the DBO Plan.

---

[5]The IRS issued final regulations for 10-or-more employer plans in July 2003.  See T.D. 9079, 2003-2 C.B. 729.

**[*13]** Please note that a trustee-to-trustee transfer (i.e., from The Advantage Plan to another welfare benefit plan such as The DBO Plan) is not permitted under applicable IRS regulations.

In April, June, July, August, and October 2003, BISYS provided employer participants with additional correspondence reiterating their need to terminate participation in the Advantage Plan by December 31, 2003, and advising as to the mechanics and tax results of such termination.

On February 8 and 11, 2003, Ms. Campbell, on behalf of BISYS, sent to Mr. O'Connor, representing Hardware, identical letters acknowledging receipt of his request to transfer to another plan administrator; she reiterated BISYS position in earlier correspondence (e.g., the January 20, 2003, letter to employer participants in the Advantage Plan) that BISYS "cannot allow a transfer to another plan administrator * * * [as] such a transfer may put the integrity of the entire plan at risk." The letters then offered to Hardware the alternative options of staying in the Advantage Plan and paying its share of the fiduciary audit fee referred to in its September 20, 2002, letter to employer participants or terminating the plan. Assuming Mr. O'Connor's decision to terminate, the letters requested a certified copy of Hardware's corporate resolution to terminate its participation in the plan using an enclosed form of corporate resolution as a guide.

**[*14]** On April 1, 2003, Ms. Campbell, on behalf of BISYS, sent Mr. O'Connor a letter acknowledging his decision not to participate in the fiduciary audit of the Advantage Plan, again requesting his submission of a certified copy of Hardware's corporate resolution to terminate its participation in the plan (with a new sample resolution attached) and requesting that he also submit signed transfer of ownership (of the policy with Jefferson Pilot on his life) and change of beneficiary designation forms (also enclosed) to BISYS. The letter stated that, upon termination, each employee covered by Hardware's participation in the Advantage Plan would be entitled to the net surrender value of the policy covering the employee's life.[6]

Not having received any response from Mr. O'Connor, on behalf of Hardware, to its April 1, 2003, letter, on October 9, 2003, BISYS sent Mr. O'Connor a letter reiterating the urgency of Hardware's terminating its participation in the Advantage Plan and withdrawing from it the policies covering him and Mr. Ashe. The letter stated BISYS' intent to dissolve the plan trust by December 31, 2003, and to direct the trustee, beginning December 1, 2003, "to

---

[6]Mr. O'Connor and a nonshareholder employee of Hardware, David Ashe, were insured under the Advantage Plan, and BISYS furnished transfer of ownership and change of beneficiary designation forms for both.

[*15] begin surrendering any life insurance policies that are still owned by the Trust in order to fully liquidate the Trust and make final distributions."[7]

On October 7, 2003, Mr. O'Connor, on behalf of Hardware, executed the termination of participation in the Advantage Plan resolution (Hardware's termination resolution) previously forwarded to him, in blank, by BISYS, Hardware's withdrawal from the plan to be effective as of that same date. Hardware's termination resolution was sent to Frank Pragosa of BISYS on October 20, 2003.

On October 29, 2003, shortly after receiving Hardware's termination resolution, Mr. Pragosa mailed to Mr. O'Connor transfer of policy ownership and change of beneficiary designation forms for both Mr. O'Connor and Mr. Ashe. The transfer of policy ownership forms were signed on behalf of BB&T as trustee of the Advantage Plan under a date of October 28, 2003. The rest of the form, essentially providing for the name, address, and signature of the new policy owner, was left blank. Mr. Pragosa also enclosed an Adopting Employer Acknowledgement form, to be completed and executed by Mr. O'Connor on behalf

---

[7]Consistent with that advice, the BISYS board of directors, on October 15, 2003, resolved to terminate the Advantage Plan "effective as of December 31, 2003", and, in accordance with sec. 7.08 of the plan, permit participant employers to withdraw from the plan.

[*16] of Hardware, acknowledging that Hardware's covered employees had "filled out" the transfer of ownership and change of beneficiary forms. The transfer of policy ownership form for the policy on Mr. O'Connor's life with the Benistar Plan shown as the new policy owner was completed and executed by Mr. Carpenter on behalf of the Benistar 419 Plan on November 11, 2003. The Adopting Employer Acknowledgement form was executed by Mr. O'Connor on behalf of Hardware and marked received by BISYS on November 20, 2003. As noted supra, the actual transfer of ownership of the policy on Mr. O'Connor's life from BISYS to Benistar did not occur until January 2004.

The Notice

In the "Explanation of Items" portion of the notice, respondent first states: "The portion of the payments [contributions to the Advantage Plan] * * * used to pay the cost of providing life insurance * * * [for 2003] is includible in your income pursuant to Section 61 * * * and Treasury Regulation section 1.61-2(d)(2)(ii)." In addition, respondent states: "The portion of the payments in excess of the amount * * * used to pay the cost of providing life insurance protection for you for * * * [2003] was made for your economic benefit * * * [and is includable in income as deferred compensation under either sections 301 and 61

[*17] or sections 402(b) and 83]".  Thus, the notice seeks to tax petitioners on all payments made on their behalf to the Advantage Plan trust.[8]

OPINION

I.    Burden of Proof

Petitioners argue that they have satisfied all of the requirements of section 7491 necessary to shift the burden of proof to respondent pursuant to that section; i.e., they have "introduce[d] credible evidence with respect to any factual issue relevant to ascertaining the liability" in this case, see sec. 7491(a)(1), and they have maintained proper books and records and thoroughly cooperated with respondent's requests for "witnesses, information, documents, meetings and interviews" in compliance with section 7491(a)(2).  Respondent disagrees and argues that, in any event, the stipulated facts and exhibits "should be more than enough to show that petitioners failed to report income from their receipt of life

_____

[8]The parties have stipulated that, if we find that there was a taxable event by which the O'Connor policy is includable in petitioners' income for 2003, the proper measure of that value is the policy's "accumulation value" and that that value in 2003 was $415,712.  That stipulation apparently represents a concession by petitioners that, if the O'Connor policy is properly includable in petitioners' 2003 income, the proper income adjustment arising out of that inclusion is $415,712, not the income adjustment in the notice of $395,051.  Respondent has not sought a corresponding increase in the amount of the determined 20% sec. 6662(a) penalty.

[*18] insurance policies from * * * [the Advantage Plan] in the 2003 year, and that petitioners are subject to a penalty under section 6662(a)."

Because we decide this case on the basis of a preponderance of the evidence, the assignment of the burden of proof herein is immaterial. See Kean v. Commissioner, 91 T.C. 575, 601 n.40 (1988) ("Our determinations have been made on the basis of the preponderance of the evidence; accordingly, it is immaterial * * * who bears the burden of proof. Deskins v. Commissioner, 87 T.C. 305, 323 n.17 (1986).").

II. Respondent's Income Adjustment

A. The Parties' Arguments

1. Petitioners' Arguments

Petitioners first argue that Mr. O'Connor was not in constructive receipt of his policy in 2003 (i.e., the policy was not "set apart for him, or otherwise made available", see sec. 1.451-2(a), Income Tax Regs.) because "Mr. O'Connor was unable to collect anything from BISYS in 2003 due to the impasse created in 2002 by BISYS' insistence upon indemnification from Benistar before engaging in any transfer of assets and Benistar's flat refusal to do so." Petitioners further state that "the transfer of the O'Connor policy on the insurer's books and records and the recognition of Benistar as the new owner and beneficiary of the O'Connor policy

[*19] * * * [occurred] in 2004, not in 2003." Petitioners also argue that the pooling of risk among all employers participating in the plan precluded Mr. O'Connor from constructively receiving the policy until its actual transfer in 2004.

Petitioners also argue that (1) section 1035(a)(1), which provides for nonrecognition of gain on an "exchange" of life insurance policies, applies to preclude recognition of gain to them on the transfer of the O'Connor policy from the Advantage Plan to the Benistar Plan, and (2) under sections 83 and 402(b) they are not required to include in income for 2003 the value of Mr. O'Connor's interest in the Advantage Plan because that interest was not substantially vested in 2003.

Lastly, petitioners argue that there was no constructive dividend distribution by Hardware to Mr. O'Connor with respect to the former's interest in either the Advantage Plan or the Benistar Plan because "there was neither any contribution in 2003 made by Hardware towards a policy premium to either * * * [plan] on behalf of Mr. O'Connor during * * * [that year] nor was there any unrestricted right to either demand or receive a benefit payment from either * * * [plan]".

2.    Respondent's Arguments

On brief, respondent specifically eschews reliance on the constructive receipt doctrine and, by not addressing it on brief, he also ignores the notice's alternative argument that Mr. O'Connor received a constructive dividend taxable

[*20] to petitioners under sections 61 and 301. Rather, on brief, respondent premises his income adjustment for 2003 primarily on his argument that Mr. O'Connor was vested in his policy in 2003, either when Hardware terminated its participation in the Advantage Plan by submitting its corporate resolution to that effect to BISYS or when BISYS provided a transfer of policy ownership form, signed by the trustee, to Mr. O'Connor, which allowed Mr. O'Connor to transfer the policy to a new owner, in either event, thereby becoming taxable on the net cash value of the policy under sections 402(b)(1) and 83. Therefore, we restrict our analysis to a determination of the merits of that argument by respondent.[9]

Respondent also rejects petitioners' argument that the policy transfer from the Advantage Plan to the Benistar Plan constituted a nontaxable transaction under section 1035, which provides that no gain or loss shall be recognized on the "exchange" of one contract of life insurance for another contract of life insurance. See sec. 1035(a)(1). Respondent argues, in essence, that, because there was no "exchange" of policies by Mr. O'Connor, section 1035 is inapplicable.

---

[9]Respondent also argues that the O'Connor policy was, in substance, "actually distributed or made available" to Mr. O'Connor in 2003, causing petitioners to be taxable under sec. 402(b)(2). Because we find petitioners taxable for 2003 under sec. 402(b)(1), we do not address respondent's sec. 402(b)(2) arguments.

**[*21]** B.     Applicable Law

Pursuant to section 402(b)(1), employer contributions to a nonexempt employee trust are included in the employee's gross income to the extent that the employee's interest in such contributions is substantially vested (within the meaning of section 1.83-3(b), Income Tax Regs.) at the time the contributions are made.  See sec. 1.402(b)-1(a)(1), Income Tax Regs.  If an employee's rights under a nonexempt employee trust become substantially vested during a taxable year of the employee, and the taxable year of the trust ends with or within such year, the value of the employee's interest in the trust on the date of such vesting is included in the employee's gross income for that taxable year.  See id. para. (b)(1).

An employee's interest in property is substantially vested "when it is either transferable or not subject to a substantial risk of forfeiture."  Sec. 1.83-3(b), Income Tax Regs.  Whether a risk of forfeiture is substantial depends on the facts and circumstances.  Id. para. (c)(1).  A substantial risk of forfeiture exists where "rights in property that are transferred are conditioned * * * upon the future performance (or refraining from performance) of substantial services by any person, or the occurrence of a condition related to a purpose of the transfer, and the possibility of forfeiture is substantial if such condition is not satisfied."  Id.

**[*22]** C.     Analysis and Conclusion

     1.     Application of Section 402(b)(1)

In Gluckman v. Commissioner, T.C. Memo. 2012-329, aff'd, 545 F. App'x 59 (2d Cir. 2013), we considered the tax ramifications of a similar distribution to employees whose employer, like Hardware, terminated its participation in the Advantage Plan trust in 2003. In Gluckman, the married taxpayers and their two children were the sole shareholders of (and one or more of them was employed by) the employer corporation. After receiving the employer's corporate resolution authorizing its withdrawal from the Advantage Plan, BISYS, on November 6, 2003, sent to the employer, care of the taxpayer husband, partially completed change of ownership and blank change of beneficiary designation forms, as well as duplicate copies of the underlying life insurance policies on the lives of the taxpayer employees. The original insurance policies were provided to the taxpayers' insurance agent. The change of policy ownership forms had already been endorsed by the Advantage Plan trustee as the current owner of the policy. The completion of the change of ownership forms and the actual transfer of the policies to a new plan did not occur until 2004. Id. at *9-*10, *16.

The taxpayers argued that, "because they never owned the policies [i.e., because there was, in essence, a trustee-to-trustee transfer], they did not control

[*23] the policies, and their interests in the policies were at all times subject to a substantial risk of forfeiture." Id. at *12. We rejected the taxpayers' argument. We noted, first, that, because of the Advantage Plan requirement that covered employees remain employed by the participating employer to remain eligible for benefits, the parties agreed that the taxpayer employees' interests in the plan were subject to a substantial risk of forfeiture through 2002. Id. at *14. We then noted that when the taxpayer husband's employer "submitted its resolution in October 2003, however, the situation was markedly different" because "[c]ontinued employment was no longer a requirement" and, under the Advantage Plan, the plan could (1) offer the policies for purchase by the employees, (2) distribute the policies to the covered employees, or (3) transfer the policies to another welfare benefit plan. Id. at *15. As noted supra, BISYS, in November 2003, did, in fact, distribute to the taxpayer husband both duplicate copies of the policies and partially completed transfer of ownership forms lacking only the new owner information. On the basis of those facts we stated:

> These actions placed petitioners' underlying policies squarely within their control because petitioners were then free to name the policies' new owner and beneficiary, which could have been themselves or another welfare benefit plan. When a taxpayer has dominion and control over property, the value of such property generally will be included in his or her gross income. See Cadwell v. Commissioner, 136 T.C. 38, 52-56 (2011), aff'd without published opinion, 109

[*24] A.F.T.R.2d (RIA) 2012-2693 (4th Cir. 2012); Chambers v. Commissioner, T.C. Memo. 2011-114.

Gluckman v. Commissioner, at *16. We cited Cadwell, which involved the conversion of a welfare benefit plan from a multiple-employer plan to a single-employer plan, for the proposition that the taxpayer's interest in the latter became vested "because he gained the ability to control the plan assets when the plan was converted to a single-employer plan." Id. at *18. We then concluded: "Here, either at the time * * * [the employer] submitted its corporate resolution withdrawing from the plan or when the change of ownership and beneficiary forms were sent to them, petitioners gained the ability to control their underlying policies." Id.

Petitioners make the point that Mr. Pragosa of BISYS, in a deposition taken in connection with this case and related cases involving the same issue, testified that notwithstanding BISYS' stated position prohibiting any trust-to-trust transfers, it did in fact allow a number of such transfers in 2003. We disposed of a similar claim in Gluckman, stating:

> [E]ven if trustee-to-trustee transfers to other plans were still being done by the Advantage Plan, such a transfer simply did not occur here. BISYS distributed the change of ownership and change of beneficiary designation forms to petitioners, the covered employees, in care of * * * [the employer] and to petitioners' insurance agent, not to another plan trustee.

**[\*25]**      Once the change of ownership and change of beneficiary designation forms were received, petitioners had the ability to name themselves or another welfare benefit plan as the owner and beneficiary of the underlying policies.  Because the policies were subject to petitioners' direct control, the transaction was not a trustee-to-trustee transfer. * * *

Id. at *19.

We held that the taxpayers' interests in the Advantage Plan, represented by their underlying policies, were substantially vested under section 402(b)(1) in 2003.  Id. at *21.

Petitioners seek to distinguish Gluckman from this case on two grounds. First, Mr. O'Connor had essentially enrolled Hardware in the Benistar Plan in 2002, the year before any request to BISYS for a transfer of the O'Connor policy held by the Advantage Plan to the Benistar Plan took place.  Moreover, that request actually emanated from the Benistar Plan, not from Mr. O'Connor. Second, in Gluckman, but not in this case, BISYS transferred "the original copies of the insurance policies to the taxpayer's insurance agent with duplicate copies to the taxpayer."  Petitioners argue:  "Having the original policy in hand, together with the partially completed policy transfer form, can be said to produce dominion and control, whereas the O'Connor policy remained at all times within the

**[*26]** dominion and control of the insurance company and the Advantage Plan". Neither of petitioners' attempts to distinguish Gluckman withstands scrutiny.

It is clear that Hardware's 2002 attempts to terminate its participation in the Advantage Plan, adopt and participate in the Benistar Plan, and have BISYS transfer the O'Connor policy to the Benistar Plan were unsuccessful. The transfer of policy ownership form for transferring the O'Connor policy from the Advantage Plan to the Benistar Plan was not signed by anyone on behalf of BISYS as the "Old Owner" of that policy. Without that signature (i.e., the Advantage Plan trustee's agreement to transfer the O'Connor policy), Mr. O'Connor was powerless to transfer it to the Benistar Plan. Moreover, because the trustee transfer agreement required the Benistar Plan to indemnify BISYS and the Advantage Plan for any liabilities arising out of Hardware's participation in the latter plan, Mr. Carpenter refused to sign that agreement on behalf of the Benistar Plan. As a result, there was no right to require a transfer and no actual transfer of the O'Connor policy in 2002. Furthermore, we surmise that Mr. O'Connor knew that his attempts to effect a 2002 direct trust-to-trust transfer of his policy were unsuccessful. Otherwise, he would not have again, in October 2003, submitted to BISYS Hardware's corporate resolution to terminate its participation in the Advantage Plan as directed by BISYS and, then, when he received them from

[*27] BISYS, sent the new change of policy ownership and change of beneficiary designation forms, already signed by BB&T as trustee of the Advantage Plan, to Mr. Carpenter, who signed them on behalf of the Benistar Plan.

It is also clear that our decision in Gluckman did not depend on the fact that duplicate copies of the insurance policies were transmitted to the taxpayers and the originals to their insurance agent. The lynchpin of our decision in Gluckman was our determination that "[o]nce the change of ownership and change of beneficiary designation forms were received, petitioners had the ability to name themselves or another welfare benefit plan as the owner and beneficiary of the underlying policies." Gluckman v. Commissioner, at *19.[10]

---

[10]As noted supra, we stated in Gluckman v. Commissioner, T.C. Memo. 2012-329, at *18, aff'd, 545 F. App'x 59 (2d Cir. 2013), that the taxpayers became vested in the underlying policies "either at the time * * * [the employer] submitted its corporate resolution withdrawing from the plan or when the change of ownership and beneficiary forms were sent to them". Gluckman v. Commissioner, at *18. It was unnecessary in Gluckman to select between those two alternatives because both occurred in the same taxable year, 2003. Here too, both events occurred in 2003. Therefore, we find it unnecessary to decide whether Hardware's submission of its resolution terminating its participation in the Advantage Plan was, by itself, sufficient to vest Mr. O'Connor in the ownership of his life insurance policy. We note, however, that, in affirming our decision in Gluckman, the Court of Appeals for the Second Circuit appears to have selected the time at which the change of ownership and beneficiary forms were sent to the taxpayers as the time at which they became substantially vested in the underlying policies. See id., 545 F. App'x at 63.

**[\*28]** We see no reason to depart from our analysis and conclusion in <u>Gluckman</u>, and we hold that petitioners were substantially vested in the O'Connor policy in 2003 under section 402(b)(1).

### 2. Application of Section 1035

We agree with respondent that section 1035 is inapplicable to the transfer of the O'Connor policy from the Advantage Plan to the Benistar Plan. As respondent points out, there was no "exchange" of policies as required under section 1035(a)(1). Rather, the same policy was merely transferred from one owner to another, the only issue being whether Mr. O'Connor, who had a right to keep the policy instead of opting to have it transferred to the Benistar Plan, had income arising out of that right. The foregoing transaction simply is not covered by section 1035, as there must be an actual or, at least, a constructive exchange of one policy for another. See <u>Greene v. Commissioner</u>, 85 T.C. 1024 (1985).

## III. Accuracy-Related Penalty

### A. The Notice

By the notice, respondent determined the 20% accuracy-related penalty under section 6662(a) against petitioners on the ground that they "had an underpayment attributable to substantial understatement of income tax and * * * [they] have not shown * * * [they] had reasonable cause for the underpayment of

[*29] tax and that * * * [they] acted in good faith." The notice goes on to state that the understatement amount is reduced where there was substantial authority for the tax treatment of an item, adequate disclosure of the item, and a reasonable basis for its tax treatment, but that caveat appears to be inapplicable boilerplate as the amount of the penalty, $28,483, is exactly 20% of the notice's determined tax deficiency of $142,416.

B.    Applicable Law

Section 6662(a) and (b)(1)-(3) provides for an accuracy-related penalty (the penalty) in the amount of 20% of the portion of any underpayment attributable to, among other things, negligence or intentional disregard of rules or regulations (without distinction, negligence), any substantial understatement of income tax, or any substantial valuation misstatement.

A substantial understatement of income tax exists for an individual if the amount of the understatement exceeds the greater of 10% of the tax required to be shown on the return or $5,000. See sec. 6662(d)(1)(A). Respondent has established that petitioners' understatement of income tax for 2003 is substantial as it exceeds 10% of the correct tax ($142,416 is more than 10% of the correct 2003 tax, as adjusted by respondent, of $538,558), which is greater than $5,000. Therefore, we need not consider the merits of respondent's argument that

[*30] petitioners were negligent and disregarded rules and regulations in not reporting the income for 2003 equal to the value of the O'Connor policy for that year.

Section 6664(c)(1) provides that the penalty shall not be imposed with respect to any portion of an underpayment if a taxpayer shows that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, that portion.

> The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. * * * Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of * * * law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer. * * * Reliance * * * on the advice of a professional tax advisor * * * does not necessarily demonstrate reasonable cause and good faith. * * *

Sec. 1.6664-4(b)(1), Income Tax Regs.

Reasonable cause has been found when a taxpayer selects a competent tax adviser, supplies the adviser with all relevant information and, in a manner consistent with ordinary business care and prudence, relies on the adviser's professional judgment as to the taxpayer's tax obligations. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); sec. 1.6664-4(b)(1), Income Tax Regs.; cf. United States v. Boyle, 469

**[*31]** U.S. 241, 251 (1985). A taxpayer may rely on the advice of any tax adviser, lawyer, or accountant. See Boyle, 469 U.S. at 251. Reliance on a professional tax adviser will not be considered reasonable, however, if the adviser is a promoter of the transaction or suffers from "a conflict of interest * * * that the taxpayer knew of or should have known about." Neonatology Assocs., P.A. v. Commissioner, 299 F.3d at 234; Pasternak v. Commissioner, 990 F.2d 893, 903 (6th Cir. 1993), aff'g Donahue v. Commissioner, T.C. Memo. 1991-181. "[T]he taxpayer's education, sophistication and business experience will be relevant in determining whether the taxpayer's reliance on tax advice was reasonable and made in good faith." Sec. 1.6664-4(c)(1), Income Tax Regs.

C.    Analysis and Conclusion

Under section 7491(c), respondent bears the burden of production, but not the overall burden of proof, with respect to petitioners' liability for the section 6662(a) penalty. See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). We have previously stated that the "burden imposed by section 7491(c) is only to come forward with evidence regarding the appropriateness of applying a particular addition to tax or penalty to the taxpayer." Weir v. Commissioner, T.C. Memo. 2001-184, 2001 WL 829881, at *5. By demonstrating that petitioners' understatement of income tax exceeds the thresholds for a finding of "substantial

[*32] understatement of income tax" under section 6662, respondent has satisfied his burden of production.

Respondent argues that petitioners have failed to establish either reasonable cause or good-faith reliance on professional advisers as justification for their substantial understatement of income tax. Petitioners argue that, because of the complexity of the issues involved in this case, they were justified, as neophytes with respect to "the nuances and subtleties of Federal tax law", in relying on "their professionals' interpretation of the relevant provisions." They further claim that there was substantial authority for their return position and "no direct authority * * * to the contrary." In rejecting petitioners' arguments, respondent notes that BISYS warned Mr. O'Connor repeatedly that covered employees of employers terminating their participation in the Advantage Plan were taxable on the value of their policies. Respondent also notes that there is no evidence that any of the advisers that petitioners may have consulted were qualified tax advisers familiar with the tax aspects of the transactions at issue in this case.

We agree with respondent. Although petitioners' 2003 return was prepared by Frederick A. Ciampa, a certified public accountant, there is no evidence that he reviewed or was at all familiar with the events occurring in 2003 that resulted in Hardware's termination of its participation in the Advantage Plan and the eventual

[*33] transfer (at Mr. O'Connor's direction) of the O'Connor policy to the Benistar Plan. The record indicates only that Mr. Ciampa, on or before October 3, 2002, advised that Mr. O'Connor's "current employee benefit plans" be transferred to Benistar; i.e., he recommended pursuing the direct trust-to-trust transfer that did not take place in either 2002 or 2003. Moreover, there is no evidence that Mr. O'Connor made Mr. Ciampa (or any other professional tax adviser) aware of BISYS' advice that the plan termination and policy transfer events of 2003 would result in taxable income to employees covered by the Advantage Plan.

We sustain respondent's determination of the 20% penalty under section 6662(a).

Decision will be entered under Rule 155.